BRIDGET W. LEFEBER
BERG LILLY, PC
1 West Main Street
Bozeman, MT 59715
Ph: 406.587.3181
Fax: 406.587.3240
bridgetl@berglawfirm.com

*Attorneys Plaintiff*

GALLATIN COUNTY CLERK
OF DISTRICT COURT
JENNIFER BRANDON

2018 NOV 21  PM 2: 58

FILED

BY_____DEPUTY

## MONTANA EIGHTEENTH JUDICIAL DISTRICT COURT
## GALLATIN COUNTY

| | | |
|---|---|---|
| KIM BODINE, | ) | Cause No. DV-18-1222-C |
| | ) | The Honorable John C. Brown |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **COMPLAINT AND** |
| | ) | **DEMAND FOR JURY** |
| SALESFORCE.COM, INC. and | ) | **TRIAL** |
| JOHN and JANE DOES 1-5, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Kim Bodine complains and alleges as follows against Defendant

Salesforce.Com, Inc. and John and Jane Does 1-5:

## PARTIES

1.    Kim Bodine is a resident of Bozeman, Montana.  Kim Bodine is a

Exhibit A, Page 1 of 37

woman. Ms. Bodine has over 12 years of sales experience in the cloud computing technology market.

2.     Upon information and belief, Salesforce.Com, Inc. ("Salesforce") is a Delaware corporation authorized to transact business in the State of Montana.

3.     Upon information and belief, Salesforce's principal office is located in San Francisco, California. Upon information and belief, Salesforce employs more than fifty (50) employees.

4.     Defendants John and Jane Does I-V are individuals, partnerships, corporations, and other unknown persons or entities who/which may be responsible and liable to Ms. Bodine.

## ALLEGATIONS CONCERNING JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action. Mont. Const. Art. VII, § 4, *Yellowstone Freight Sys. v. Donnelly*, 494 U.S. 820, 824-825 (1990), 110 S.Ct. 1566.

6.     This Court has personal jurisdiction over the parties in this matter. Rule 4(b)(1), M.R.Civ.P.

7.     Venue is proper in the Montana Eighteenth Judicial District Court, Gallatin County. § 25-2-121(2)(b), M.C.A., §§ 25-2-122(2)(a) and (b), M.C.A.

## GENERAL BACKGROUND ALLEGATIONS

8.     On or about March 2, 2015, Ms. Bodine was hired by Salesforce as a Senior Account Executive for Salesforce's Public Sector State and Local Business Unit (the "PBU"). Ms. Bodine was a Montana employee, and was originally assigned to the states of Louisiana, Arkansas, Oklahoma, and Mississippi, and reported to Django Degree.

9.     At the time Salesforce hired Ms. Bodine, it was aware that Ms. Bodine resided in Montana and would perform work for Salesforce out of Montana. Salesforce corresponded, and participated in multiple phone calls, with Ms. Bodine while she resided and performed work in Montana for Salesforce. Salesforce also agreed that income taxes, unemployment insurance premiums, and wages were to be paid to Ms. Bodine in Montana.

10.     On or around February 1, 2016, Ms. Bodine received a favorable transfer to cover the states of Kentucky, Tennessee, North Carolina, Alabama, and West Virginia (collectively referred to as the "Southeast Territory").

11.     Ms. Bodine also received a positive written employment evaluation for her performance.

12.     After Ms. Bodine's transfer into the Southeast Territory, Dan Scheel, Salesforce's Regional Sales Manager for the PBU, became Ms. Bodine's immediate manager/supervisor.

13.    Ms. Bodine continued to be based out of Bozeman, Montana, with

respect to her work in the Southeast Territory and performed worked out of her

home in Bozeman, Montana.

14.    In 2016, 2017, and 2018, Salesforce had in place a "Code of Conduct"

which governed Salesforce's treatment of employees.  The Code of Conduct

provides in relevant part:

> Our Code could be best summed up in the Hawaiian greeting *aloha,*
> which means compassion, respect, and affection.  It underlies our
> belief that we must treat others ethically and always do right by the
> people who depend upon us....
> This code applies to everyone at Salesforce...
> **Personal Dignity**
> Solid teamwork requires all employees to treat each other with dignity
> and respect.

15.    In 2016, 2017, and 2018, Salesforce also had in force a Salesforce

Global Employee Handbook.

16.    Under the "Work Environment" Section of Salesforce's Global

Employee Handbook, Salesforce states that its Equal Opportunity Employment

policy:

> protects current and prospective employees, no matter where they are
> in their Salesforce employment journey.  It also applies to recruiting,
> hiring, job assignment, compensation, promotion, benefits, training,
> discipline, termination, and everything in between.  Recruiting, hiring,
> and promotion decisions at Salesforce are fair and based on merit.
> The same goes for compensation, benefits, promotions, transfers,
> reduction in workforce, recall, training, and education.

17.     Under the "Harassment/Discrimination-Free Workplace" Section of

Salesforce's Employee Handbook, Salesforce states in part:

> We all need to hold ourselves accountable for what we say and do to
> make Salesforce an inclusive, productive, and fulfilling place to work.
> We expect this from our Ohana when it comes to interacting with
> employees, customers, partners, and stakeholders.
>
> It's your right – as an employee, contingent worker, customer, vendor,
> or anyone who does business with Salesforce – to operate in a place
> that's free of discrimination, harassment, and unwelcome, offensive,
> or improper conduct.  Harassment or discrimination against
> employees or anyone we engage with is unacceptable – whether it's
> based on race, national origin, religion, sex, sexual orientation, gender
> expression or identity, transgender status, disability, age, or any other
> classification protected by law.
>
> Our policy — and in some instances the law — prohibits this kind of
> behavior.
>
> **Who does this apply to?**
> This policy applies to anyone who's part of our Ohana or represents
> Salesforce at our workplace.  What's our workplace?  Salesforce
> offices or event venues, customer sites, business trips, Chatter, or any
> other Salesforce activity (or any activity that is sufficiently linked to
> Salesforce), during or after normal business hours.
>
> **What do harassment and discrimination include?**
> Harassment and discrimination includes any verbal, physical, or visual
> conduct based on sex, sexual orientation, gender expression or
> identity, transgender status, race, age, national origin, disability, or
> any other legally-protected classification listed above or protected by
> country, state, provincial, or local law, if:
>
>> • It explicitly or implicitly becomes part of a term or condition
>> of your employment or relationship with Salesforce.
>> • You're submitted to this kind of conduct as part of decisions
>> about your employment or relationship with Salesforce.

Page 5 of 37

- It creates a hostile or offensive work environment.

Not only do we prohibit discrimination and harassment, we also prohibit behavior that could potentially be considered or perceived as harassment or discrimination. This is not an exhaustive list, but here are some examples:

- Unwelcome sexual advances or perceived sexual advances, requests for sexual favors, obscene gestures, lewd, vulgar or obscene communication (either written, verbal, or visual), or any unwelcome physical contact
- Sexually graphic images, calendars, or posters; sexually explicit, racially offensive or derogatory texts, emails, or voicemails, social media; or other verbal or physical conduct of a sexual or offensive nature, such as uninvited touching of a sexual nature or sexually related comments
- Other forms of inappropriate harassment or discrimination may include (but are not limited to) racial epithets, slurs, and derogatory remarks, stereotypes, jokes, posters or cartoons based on race, ethnic background, national origin, age, disability, marital status, or other legally protected categories
- Employment decisions based on any of the categories that are listed above and protected by our policy

Harassment doesn't require intent to offend. It may be any conduct that is unwelcome by the recipient. This includes conduct meant as a joke, prank, or even a compliment.

Any conduct that offends or makes someone feel uncomfortable – no matter how it's delivered – could be considered harassment. And even if the harassing or discriminatory behavior isn't severe and pervasive enough to be considered unlawful, it could still be considered to be in violation of Salesforce policy.

**How to report harassment, discrimination, or bullying**
If you have a complaint or concern about harassment, discrimination, bullying and/or retaliation, tell your manager or any manager that you feel comfortable reporting this to.

Exhibit A, Page 6 of 37

You can also report your complaint to Employee Success or EthicsPoint, an external reporting resource. With EthicsPoint, you can report work-related issues anonymously, depending on the applicable laws of where you work...

**What should I expect after I report an incident?**
After you report an incident, the appropriate Salesforce team will conduct a prompt and thorough investigation. If improper conduct is discovered, appropriate corrective action will be implemented.

18.    Under the "Anti-Retaliation" Section of Salesforce's Global

Employee Handbook, Salesforce states in part:

If you report any incidence of harassment, discrimination, bullying, or any conduct that violates Salesforce policies or the law, we will do all that we can to ensure that you will not be retaliated against for doing so. We strictly prohibit retaliation against an employee who makes a complaint, raises a concern, provides information, or helps in an investigation or proceeding when it comes to conduct that any Salesforce employee believes to be a violation. We want our Ohana to feel comfortable speaking up when they see – or even suspect in good faith – illegal, unethical, or inappropriate conduct. And you should never have to worry about retaliation.

19.    The policies set forth in Salesforce's Global Employee Handbook that

were in effect during the years of 2016, 2017, and 2018 applied to Ms. Bodine's

employment with Salesforce during her corresponding years of employment.

20.    On March 9 and 10, 2016, Ms. Bodine attended the sales kick-off

meeting for the PBU in Baltimore, Maryland. The PBU for Salesforce is

predominantly male employees. Ms. Bodine, along with other PBU employees,

was bussed by Salesforce to a restaurant for an evening event. Upon arrival,

Page 7 of 37

Exhibit A, Page 7 of 37

Ms. Bodine discovered that Salesforce had flown in woman dancers who were dressed in lampshades, butterfly costumes, and mermaid costumes and were dancing proactively on raised platforms and around the restaurant. A VIP area was also established upstairs. Ms. Bodine left early from the event, uncomfortable, but learned later that some dancers ended up in body paint only.

21.    During Ms. Bodine's employment in the Southeast Territory, Tim McCormick was the Area Vice President of State and Local Government for Salesforce covering the entire U.S. McCormick was a manager of Scheel and an indirect manager of Ms. Bodine.

22.    During Ms. Bodine's employment in the Southeast Territory, both Scheel and McCormick were Ms. Bodine's managers as contemplated by Salesforce's "Harassment/Discrimination-Free Workplace" policy in its Salesforce's Global Employee Handbook.

23.    At all times relevant to this Complaint, Lauren Collett occupied the position of Technical Resource (referred to as "Collett"). During Ms. Bodine's employment in the Southeast Territory, Collett was on Ms. Bodine's account team and charged with doing product demonstrations and answering technical questions for those clients that Ms. Bodine was working with to sell Salesforce software.

24.    Prior to October 2016, Ms. Bodine successfully developed business territories for Salesforce in the PBU.

Page 8 of 37

25.  In 2015 and 2017, Ms. Bodine achieved her target quotas for Salesforce.

26.  Beginning in October 2016 and continuing into 2017, Ms. Bodine became subject to a hostile and offensive working environment created by Scheel in her employment at Salesforce.

27.  Beginning in October 2016 and continuing into 2017, Ms. Bodine also became subject to disrespectful treatment by Scheel under Salesforce's Code of Conduct.

28.  Beginning in October 2016 and continuing into 2017, Ms. Bodine also became subject to inappropriate treatment by Scheel under Salesforce's Global Employee Handbook.

29.  Beginning in 2017, Ms. Bodine also became subject to hostile, offensive, disrespectful, and inappropriate treatment by McCormick under Salesforce's Global Employee Handbook.

30.  Ms. Bodine was also subjected to an atmosphere where participation in a sexually offensive atmosphere was made a condition of retaining job benefits.

31.  Ms. Bodine's supervisor, Scheel, began to make unwelcome, sexually suggestive comments to Ms. Bodine.

32.  Scheel would contact Ms. Bodine at inappropriate hours to discuss his personal matters with her.

33.　　During one-on-one meetings between Scheel and Ms. Bodine, Scheel would share very personal information about his divorce, and tell Ms. Bodine about struggles with his wife.  Several times, Scheel would tell Ms. Bodine that he "loved her" and that she was the "nicest" and "best" person he had ever met.

34.　　On October 21, 2016, Ms. Bodine was in Nashville, Tennessee in connection with work.  She was with her work team, Collett and Scheel.  Ms. Bodine believed that she, Collett, and Scheel were headed to a live music venue, but, instead, she was taken to a strip club in Nashville, Tennessee.

35.　　While at the strip club, Collett made a comment that, of course, all the strippers were all over Scheel.

36.　　Scheel leaned forward and said that a stripper is offering a "three for thirty" – referring to Scheel, Collett, and Ms. Bodine.  Collett responded, does that include "all clothes off"?  Scheel then asked Ms. Bodine whether she knew that Collett was a pole dancer.

37.　　Ms. Bodine, upset by being brought to the strip club and at Mr. Scheel's and Collett's unwelcome behavior, left on her own.

38.　　After Ms. Bodine left the strip club on October 21, 2016, Scheel and Colette stayed at the strip club together.

39.　　On November 17, 2016, Collett said in the presence of Scheel, that Ms. Bodine "Wants to f*** Peter", referring to a prospect and key contact of

Ms. Bodine who was employed with the State of Tennessee. Collett also talked about a wife of a co-worker consistently talking about a woman's labia. Upon information and belief, Collett was not disciplined for such comments and was, in fact, encouraged by Scheel's behavior.

40. On November 17, 2016, Scheel sent a text message to Ms. Bodine and Collett, referring to the "Money Shot". This is a sexual reference to a scene in a pornographic movie. Collett responded "Get it". Ms. Bodine did not respond.

41. Through Ms. Bodine's interactions with Scheel and Colette, Ms. Bodine became concerned that an inappropriate, intimate relationship had developed between Scheel and Colette. Ms. Bodine also became concerned that she was being retaliated against for refusing to engage in the inappropriate sexually charged atmosphere between them and in general.

42. In December 2016, Ms. Bodine wrote to Scheel to inquire whether he was trying to help Collett to become an AE. Scheel responded that it sounded like Ms. Bodine had a concern regarding the issue.

43. On February 10, 2017, in recognition of her sales achievements while at Salesforce, Ms. Bodine was approved to receive a $13,000 increase in her base salary.

44. In March 2017, Ms. Bodine, Scheel, and Collett attended customer meetings in Louisville. On the way back to the hotel, Scheel was pulled over by

the police for driving without his headlights. Scheel then drove past Collett's hotel to drop Ms. Bodine off at the hotel where she was staying, which happened to be the same hotel at which Scheel was staying. Scheel then drove away with Collett.

45. On May 10, 2017, after a dinner meeting with implementation partners, Collett, in the presence of Scheel, started talking about strip clubs. Ms. Bodine left because she was, once again, uncomfortable with the discussion. Later that evening, Collett called the executive for Salesforce strategic global SI implementation partner, Kort Crosby at Deloitte Consulting, a f****** asshole and flipped him off. Collett called Ms. Bodine in the early hours of the morning to tell her about what had occurred with the SI implementation partner before someone made her hang up the phone with Bodine. Upon information and belief, Collett was not disciplined for such comments.

46. The next morning following the May 10, 2017, incident, neither Scheel nor Collett attended Salesforce customer meetings with the Kentucky Cabinet for Economic Development and Kentucky Cabinet for Education and Workforce Development.

47. Ms. Bodine voiced to Scheel her opposition to the sexually offensive environment.

48. When Ms. Bodine complained to Mr. Scheel, she engaged in an activity protected under Title VII.

49.     Rather than appropriately investigating Ms. Bodine's legitimate complaints in accordance with Salesforce's policy, Scheel retaliated against Ms. Bodine, claiming that Ms. Bodine had personal issues with Collett.

50.     Mr. Scheel also retaliated against Ms. Bodine by interfering with her work, by purposefully excluding her from client meetings, while including Collett, leaving her off communications, and undermining Ms. Bodine to clients. Mr. Scheel further retaliated against her by threatening to put Ms. Bodine on a performance improvement plan.

51.     Mr. Scheel and Collett met with a new project manager for Nashville after Ms. Bodine had closed a sale in Nashville, excluding Ms. Bodine. Thereafter, the project manager requested an Account Executive who could, for example, provide a product demonstration. Product demonstrations at Salesforce are done by Technical Resources such as Collett, not Account Executives. Scheel and McCormick reasonably should have known this was an unrealistic request in light of the internal Salesforce delineation of roles filled by Account Executives and Technical Resources. Based on the content of the correspondence from the product manager, it was clear that Scheel and Collett had purposefully influenced this correspondence to negatively impact Ms. Bodine.

52.     On June 20, 2017, despite Ms. Bodine's high ranking performance, Mr. Scheel informed Ms. Bodine that he was planning to cut her sales territory

from four states to two states. The two states that Mr. Scheel advised Ms. Bodine she would keep were bottom tier states, one of which was running a state deficit budget and where Salesforce has no existing customer accounts. The two states to be cut were Ms. Bodine's prime states (Kentucky and Tennessee) from her prior sales contracts. Ms. Bodine protested and asked how Scheel could justify the move. Mr. Scheel threatened to put Ms. Bodine on a performance improvement plan.

53.   The next day, on June 21, 2017, Ms. Bodine emailed Tim McCormick, Scheel's supervisor. In that email, Ms. Bodine stated:

Hello Tim:

I need to have a conversation with you. It's important, so my preference is to speak with you in person. I wanted to see if you're attending the Smart Cities conference next week. If you're not able to attend the event, are you available to talk by phone on Friday.

Thank you,

Kim.

54.   On June 27, 2017, Ms. Bodine met with McCormick in person at the Smart Cities conference in Texas. Ms. Bodine complained to McCormick regarding the hostile, offensive, and unfair work environment and retaliatory conduct by Scheel.

55.     When Ms. Bodine complained to Tim McCormick about such conduct, she engaged in an activity protected under Title VII.

56.     When Ms. Bodine complained to Tim McCormick about such conduct, she engaged in an activity protected under Salesforce Global Employee Handbook.

57.     Mr. McCormick acknowledged that he was aware of the romantic relationship between Collett and Scheel. However, rather than investigating Ms. Bodine's reports of the hostile and offensive environment and retaliatory conduct for complaining about that environment, McCormick, similar to Scheel, turned the issue back on Ms. Bodine and threatened to put her on an improvement plan.

58.     Also, on June 27, 2017, McCormick told Ms. Bodine to pick one of her top two states to keep (Kentucky and Tennessee).

59.     On September 1, 2017, over Ms. Bodine's objection and complaint about harassment and discrimination, Scheel made an involuntary transfer of Ms. Bodine to a new sales territory for Salesforce altogether. The involuntary transfer included taking all four states away from Ms. Bodine despite McCormick telling Ms. Bodine that she would be permitted to keep either Kentucky or Tennessee and her high ranking sales performance. This also included taking away Ms. Bodine's Town of Cary, North Carolina, customer account, where Ms. Bodine

had been recognized by others within Salesforce for achieving substantial sales accomplishments.

60.    The involuntary transfer that occurred on September 1, 2017, was, in practicality, an even greater demotion than what occurred in June 2017, because all four states and the North Carolina account were taken away from Ms. Bodine, and she was placed in the territory of Minnesota and Wisconsin, an historically low potential, and underperforming, territory (the "MW Territory").

61.    As a top-performing Account Executive for Salesforce, Ms. Bodine should have been promoted into a better, not worse, territory or position.

62.    The involuntary transfer and demotion was done in furtherance of the hostile and offensive work environment and/or in retaliation for Ms. Bodine's reporting of the harassment and discrimination she had been subjected to at Salesforce.

63.    At the time of Ms. Bodine's September 1, 2017, involuntary transfer, she had attained nearly 140% of her Annual Contract Value Quota for 2017. This level of sales performance qualified Ms. Bodine for Salesforce's "Achievers Club" award. In fact, Ms. Bodine did receive an "Achievers Club" reward for her work in FY 2017.

64.    The June 2017 and September 1, 2017, involuntary transfers were tangible job actions taken against Ms. Bodine.

65.    The June 2017 and September 1, 2017, involuntary transfers were done in direct violation of Salesforce's Code of Conduct.

66.    The September 1, 2017, involuntary transfer of Ms. Bodine was a demotion and resulted in Ms. Bodine sustaining a significant reduction in her compensation at Salesforce.

67.    Upon information and belief, the September 1, 2017, involuntary transfer of Ms. Bodine has resulted in a loss of income of at least $150,000.00.

68.    Salesforce has, to date, refused to allow Ms. Bodine access to information about closed sales in the Southeast Territory, thereby precluding Ms. Bodine the opportunity to fully evaluate her lost compensation due to the September 1, 2017, involuntary transfer.

69.    On September 29, 2017, Ms. Bodine lodged another Complaint with Salesforce regarding the harassing, discriminatory, and retaliatory conduct she had sustained.

70.    In connection with her September 29, 2017, Complaint, Ms. Bodine requested that she be compensated for lost sales and opportunity, and that she be reinstated to her prior territory. In the alternative, Ms. Bodine requested a transfer into another Salesforce business division because she feared she would be subject to further hostile treatment in the PBU.

71.     Ms. Bodine engaged in an activity protected under Title VII when she filed her Complaint on September 29, 2017.

72.     After September 29, 2017, Lori Escobar, an Employee Relations Manager for Salesforce, contacted Ms. Bodine and informed Ms. Bodine that she would be leading the investigation into Ms. Bodine's complaint.

73.     Ms. Bodine informed Escobar that she was concerned about retaliatory conduct by both Scheel and McCormick.

74.     Ms. Bodine also informed Escobar that she feared she would be vulnerable and persecuted in subtle ways if the investigation moved forward and that she would ultimately suffer repercussions for coming forward with her complaint.

75.     Ms. Bodine informed Escobar that she had complained to McCormick about the inappropriate relationship between Scheel and Colette and the retaliation. Ms. Bodine also informed Escobar that McCormick was not interested in hearing about her complaints and had retaliated against her.

76.     Ms. Bodine also informed Lori Escobar Ms. Bodine's belief that Scheel intended to give Collett the job that had been taken away from Ms. Bodine.

77.     Upon information and belief, despite McCormick being identified by Ms. Bodine as someone involved in the retaliatory conduct and acting contrary to Salesforce's Code of Conduct, Escobar inappropriately informed McCormick of

the complaint filed by Ms. Bodine prior to Escobar interviewing McCormick, Scheel, and Collett.

78.     Despite McCormick being identified by Ms. Bodine as someone involved in the retaliatory conduct and acting contrary to Salesforce's Code of Conduct, Escobar did not investigate McCormick's actions.

79.     Upon information and belief, after McCormick learned of the Complaint filed by Ms. Bodine, McCormick tipped off Scheel about the investigation before Escobar could speak with Scheel.

80.     McCormick also immediately retaliated against Ms. Bodine by making harassing statements to her about filing her complaint with human resources.

81.     Ms. Bodine informed Escobar of this retaliation on November 4, 2018.

82.     Upon information and belief, McCormick initially informed Escobar that he would not want McCormick on his team if he engaged in the type of behavior described by Ms. Bodine.  However, after Escobar informed McCormick that Scheel violated Salesforce's Harassment-Free Workplace and would be terminated, McCormick told Escobar, contrary to his initial representations, that Salesforce should keep Scheel as an employee.  McCormick also questioned Escobar whether she had had any firsthand experiences at strip clubs.

83.     Upon information and belief, McCormick and Scheel attempted to justify the adverse employment actions taken against Ms. Bodine by offering pretextual criticisms about her performance despite her high ranking sales performance.

84.     On October 15, 2017, during the course of the investigation, Nicole Raimundo, the Chief Information Officer for the Town of Cary, North Carolina, emailed Tim McCormick about Ms. Bodine's transfer from the Town of Cary, North Carolina, account. In Ms. Raimundo's email, she informed McCormick that the Town of Cary desired to keep Ms. Bodine on as an AE. Ms. Raimundo informed Mr. McCormick that Ms. Bodine "has been fantastic and integral part of our success...Kim responds to my questions at all hours including weekends and we consider her part of our team. The loss of Kim is a difficult loss for our team."

85.     Mr. McCormick responded to Ms. Raimundo by email that same day stating "Thank you for letting me know. Kim will be your AE as long as you would like."

86.     Upon information and belief, McCormick withheld from Escobar the glowing review by the Town of Cary, North Carolina, during her investigation.

87.     Upon information and belief, McCormick reported to Escobar that it would not be likely that Ms. Bodine's states of Kentucky and Tennessee would be

assigned to one AE. However later, upon information and belief, Collett was assigned both these states.

88.     After Escobar received information from Scheel and McCormick regarding their claim of performance issues for Ms. Bodine, Escobar failed to provide Ms. Bodine with the opportunity to respond to this information before rendering her decision on the investigation.

89.     Escobar performed an inadequate investigation into Ms. Bodine's complaints of harassment, retaliation, and inappropriate relations between Scheel and McCormick.

90.     Upon information and belief, Collett and Scheel were in a romantic relationship that pre-dated Scheel's termination from Salesforce.

91.     Upon information and belief, Escobar merely took Scheel and Collett at their word regarding their relationship, rather than independently investigating the issue.

92.     Upon information and belief, Escobar took Scheel at his word despite clear evidence that his credibility was at issue, that he had been tipped off to the complaint, and that events Ms. Bodine has described had actually occurred.

93.     Upon information and belief, Escobar took McCormick at his word despite clear evidence that his credibility was at issue, that he had retaliated against Ms. Bodine, and that events Ms. Bodine has described had actually occurred.

94.    Scheel had a discriminatory animus towards Ms. Bodine before Ms. Bodine's September 2017 Complaint was filed.

95.    Scheel had a discriminatory animus towards Ms. Bodine during Escobar's investigation of the September 2017 Complaint.

96.    Scheel's discriminatory animus towards Ms. Bodine influenced Escobar's decision regarding Ms. Bodine's Complaint.

97.    McCormick had a discriminatory animus towards Ms. Bodine before Ms. Bodine's September 2017 Complaint was filed.

98.    McCormick had a discriminatory animus towards Ms. Bodine during Escobar's investigation of the September 2017 Complaint.

99.    McCormick's discriminatory animus towards Ms. Bodine influenced Escobar's decision regarding Ms. Bodine's Complaint.

100.    In November 2017, Ms. Bodine was informed by a co-worker that Collett had replaced Ms. Bodine as an Account Executive.

101.    Upon information and belief, Collett now serves the Account Executive for Tennessee and Kentucky which Ms. Bodine was promoted to and developed in the Southeast Territory.

102.    Upon information and belief, Collett continues to financially capitalize off the work that was done by Ms. Bodine.

103.    On November 14, 2017, Lori Escobar prepared a written report of her

Page 22 of 37

investigation.

104.   After investigating Ms. Bodine's Complaint, Salesforce concluded that Scheel had violated Salesforce's anti-harassment policy.

105.   Escobar initially advised Ms. Bodine verbally that there was "overwhelming evidence" to support her September 2017 Complaint.

106.   Escobar also advised Ms. Bodine that Salesforce had taken action against Scheel and McCormick.  When Ms. Bodine questioned what that meant, Escobar told Ms. Bodine that she could not disclose what action was specifically taken.

107.   Based on what was reported by Escobar, Ms. Bodine believed she would be reinstated to her prior positon and inquired with Escobar about this. Escobar responded in a hurried and mumbled fashion that she understood that there were some employment performance issues.

108.   Ms. Bodine asked Escobar to elaborate but Escobar refused to provide details to Ms. Bodine regarding her performance comment.

109.   Employee Relations has not assisted Ms. Bodine with obtaining another position within Salesforce nor assisted her in obtaining lost compensation.

110.   Salesforce did not provide specifics regarding their findings about Ms. Bodine's Complaint despite her specific request for Salesforce to do so.

111.   Salesforce intentionally withheld information from Ms. Bodine

regarding its findings that McCormick had retaliated against Ms. Bodine.

112.  Salesforce intentionally withheld information from Ms. Bodine regarding the fact that McCormick had been tipped off to her Complaint.

113.  Salesforce intentionally withheld information from Ms. Bodine regarding the fact that McCormick had tipped off Scheel that Ms. Bodine had filed a Complaint with Employee Relations.

114.  Salesforce also intentionally withheld information from Ms. Bodine regarding the nature of McCormick's and Scheel's complaints about her performance, thereby foreclosing Ms. Bodine from the opportunity to fairly and fully respond.

115.  Escobar failed to follow-up with Ms. Bodine on conflicting evidence, including McCormick's position that he had not been informed by Ms. Bodine of unfair, harassing and discriminatory conduct during her meeting with him in June 2017, or that she had reported what she believed to be an inappropriate relationship between Scheel and Collett to him in June 2017.

116.  The negligent and inadequate investigation performed by Salesforce caused Ms. Bodine damage.

117.  In 2017, Ms. Bodine was subjected to disrespectful treatment by McCormick.

118.  McCormick's disrespectful treatment of Ms. Bodine in 2017 was a

Page 24 of 37

violation of Salesforce's code of conduct.

119.   In 2017, Ms. Bodine was subjected to inappropriate treatment by McCormick.

120.   McCormick's inappropriate treatment of Ms. Bodine in 2017 was a violation of Salesforce's code of conduct.

121.   Ms. Bodine was retaliated against by McCormick in her employment at Salesforce in connection with her September 2017 Complaint about a hostile and offensive working environment.

122.   In early October 2018, Ms. Bodine was contacted by her new manager, Tom Mazur, about setting up an in-person meeting with Ms. Bodine in Chicago.

123.   In calling for this meeting, Ms. Bodine was singled out from other Account Executives within Mazur's territories.  Ms. Bodine felt as though she was being set up to receive unfair blame regarding the sales prospects in the Wisconsin/Minnesota territory, or worse, having the ground work unfairly laid for her termination.

124.   On October 23, 2018, Ms. Bodine met with Mazur, along with Mike Yeganeh, a Senior Director (Manager) of Solution Engineering at Salesforce, and others at Mazur's request.  Mike Yeganeh was Collett's manager during the time period she served as a SE tech resource on Ms. Bodine's team and was transferred

into Ms. Bodine's former Southeast Territory.

125. During the course of the meeting, Ms. Bodine reported to Mazur and others about advances being made in Wisconsin/Minnesota and also informed Mazur about the pre-existing barriers that Ms. Bodine inherited when she was transferred into those states.

126. During the meeting, Mike Yeganeh inappropriately brought up to Ms. Bodine, in front of the group, that Collett had done a great job in Kentucky and had built a book of business there. Mike Yeganeh also commented that Salesforce has never had a strong AE in Wisconsin/Minnesota, referring to Ms. Bodine. Upon information and belief, Mike Yeganeh made these comments knowing that Ms. Bodine was the former Account Executive in Kentucky and that Ms. Bodine had complained about the circumstances under which Collett was moved into the Kentucky territory that she developed. Mike Yeganeh made such comments with the intent to cast Ms. Bodine in a negative light, to cause embarrassment and harm to Ms. Bodine, and to retaliate for Ms. Bodine's earlier complaint involving Collett and Scheel.

127. On October 26, 2018, Mazur sent an email to Ms. Bodine confirming her fears that she was being unfairly blamed and set up for termination. Mazur informed her that her "performance YTD is clearly below expectations."

128. Shortly following receipt of Mazur's October 26, 2018, email,

Page 26 of 37

Ms. Bodine spoke directly with Mazur about his email and recap of the meeting. Ms. Bodine attempted to explain to Mazur her view that his comment that her performance was "clearly below expectations" was not appropriate or justified in light of the circumstances under which she had been involuntarily transferred into the Wisconsin/Minnesota territories, and the pre-existing barriers in these states that Ms. Bodine's former manager, and others within the Salesforce organization, appropriately acknowledged.

129. Ms. Bodine also attempted to explain that the fears she had expressed after her September 2017 Complaint were being played out. She further attempted to explain to Mazur how she felt extremely uncomfortable and retaliated against during the October 23, 2018, meeting based on Mike Yeganeh's comments and demeanor at the meeting.

130. Despite Ms. Bodine's attempts to discuss these issues, Mazur shut down the discussion, advising her that he did not want to know or hear about the things Ms. Bodine was attempting to explain.

131. Ms. Bodine immediately felt like she had been punched in the gut and confirmed for her that Salesforce's continued promises of dignified, fair, respectful, and ethical treatment were hollow ones.

132. On November 14, 2018, Ms. Bodine tendered her forced resignation from Salesforce.

133.   Salesforce had persistently failed to treat Ms. Bodine with respect and compassion as promised.

134.   Ms. Bodine remained in a demoted position up and through her separation from employment from Salesforce.  She has attempted to transfer within Salesforce, but has been unable to do so and has received no assistance from Employee Relations in this regard.

135.   Ms. Bodine was subject to unwelcome conduct by her supervisor and co-worker which rendered her workplace atmosphere intimidating, hostile, and offensive.  Ms. Bodine was subject to sexual advances, off color sexual jokes, use of crude language, and, ultimately, interference with her work.

136.   Ms. Bodine was a qualified female employee who was denied the benefit of her position because of her refusal to engage in and participate in the offensive and hostile work environment, her refusal to submit to sexual advances, and her opposition to the hostile and offensive work environment.

137.   Ms. Bodine supervisor's conduct in bestowing preferential treatment and favoritism upon Collett, who actively engaged in a hostile and offensive work environment, engaged in sexual banter and sexually charged activities with Scheel, undermined Ms. Bodine's motivation and work performance and deprived her of opportunities at Salesforce.

138.   Ms. Bodine's separate Complaints to her two managers were

immediately dismissed without conducting a prompt and thorough investigation.

139.   When Ms. Bodine lodged a third Complaint, Salesforce did not
perform a full, fair, and thorough investigation into Ms. Bodine's Complaints.

140.   Salesforce also failed to provide sufficient transparency in its
investigation to allow for a fair and adequate investigation.  Salesforce also
performed a cursory, and wholly inadequate, investigation into her demotion.

141.   Saleforce also failed to safeguard the confidentiality of the process,
thereby allowing many others within the Salesforce organization to gain
information regarding Ms. Bodine's Complaint.  This caused Ms. Bodine to feel
stigmatized within the company.

142.   When Ms. Bodine attempted to complain to her most recent manager
about continued retaliation and unfair treatment she had received, she was
immediately rebuked and advised that he did not want to hear about it.

143.   Salesforce has failed to take appropriate corrective action as required
by Salesforce's Global Employee Handbook to redress the harm caused to
Ms. Bodine.

144.   Salesforce has failed to take appropriate corrective action as required
by law to redress the harm caused to Ms. Bodine.  Salesforce has consistently
allowed Ms. Bodine to be shamed for her legitimate Complaints.

145.   Salesforce's failure to take corrective action to redress the harm

caused to Ms. Bodine has perpetuated the harassment and retaliation of

Ms. Bodine. Through Salesforce's negligent and inadequate investigation, it gave

effect to the retaliatory intent of Scheel and McCormick.

146.  Salesforce has failed do all that it could do as promised in its

Salesforce Global Employee Handbook to ensure that Ms. Bodine was not subject

to continuing retaliation.

147.  Salesforce has rendered working conditions so oppressive for

Ms. Bodine that resignation was her only reasonable alternative.

148.  Salesforce acted with malice and reckless indifference to

Ms. Bodine's rights, thereby entitling Ms. Bodine to punitive damages.

149.  Ms. Bodine has suffered damages, including, without limitation, wage

loss and serious emotional harm.

150.  Ms. Bodine has had to incur attorney's fees and costs associated with

this claim.

## FIRST CLAIM FOR RELIEF – WRONGFUL DISCHARGE UNDER MONTANA'S WRONGFUL DISCHARGE FROM EMPLOYMENT ACT

151.  Ms. Bodine re-alleges the allegations contained in the preceding

paragraphs to the extent such factual allegations relate to this claim for relief.

152.  At all times relevant to this Complaint, Ms. Bodine was a Montana

employee.

153.    As a result of Ms. Bodine's status as a Montana employee, her employment with Salesforce was subject to Montana's Wrongful Discharge from Employment Act.

154.    Salesforce has attempted to characterize Ms. Bodine's employment at-will.  However, Montana does not recognize at-will employment with the exception of an initial probationary period of employment.

155.    Ms. Bodine was not in a probationary period of employment with Salesforce as of September 2018, or November 14, 2018.

156.    In September 2018, Ms. Bodine was demoted into the territory of Wisconsin/Minnesota.  The Wisconsin/Minnesota territory was substantially inferior to Ms. Bodine's previous territory and resulted in an extreme cut in pay.

157.    Salesforce claims that Ms. Bodine was transferred into the Wisconsin/Minnesota territory for performance related reasons.

158.    To the contrary, Ms. Bodine had received positive reviews, a promotion, merit increases, a sales award, and achieved over her sales quota in the time leading up to her demotion into Wisconsin/Minnesota.

159.    Ms. Bodine was also demoted by Salesforce when her Town of Cary account was taken away from her a second time by Mike Daniels, the Senior Vice President of the Public Sector for Salesforce.

160.   The Town of Cary account was removed from Ms. Bodine despite the Town of Cary's previous positive reviews of Ms. Bodine and its specific request to keep Ms. Bodine as its Account Executive.

161.   The Town of Cary account was also removed from Ms. Bodine despite Salesforce's promise to the Town of Cary that Ms. Bodine would continue as its Account Executive for as long as the Town of Cary would like.

162.   On March 30, 2018, Mike Daniels emailed Ms. Bodine to inform her that the Town of Cary was very insistent on Ms. Bodine continuing in her role as Account Executive.  Nonetheless, Mr. Daniels insisted that Ms. Bodine return to the Town of Cary account in a demoted role to train her replacement and share her commissions with another Account Executive.

163.   Upon information and belief, when Ms. Bodine was removed from the Town of Cary account for a second time by Mike Daniels, the Town of Cary had not informed Salesforce that it was agreeable to removing Ms. Bodine from the account.

164.   When Ms. Bodine was moved into the Wisconsin/Minnesota territory, her prior manager agreed with Ms. Bodine that the territory was historically underperforming, and conceded that is was unlikely, if not impossible, for Ms. Bodine to reach her target quota in the new territory given the realistic, pre-existing barriers that existed for the PBU in Wisconsin/Minnesota.

165. Contrary to Salesforce's previous acknowledgment and recognition of the real and pre-existing obstacles in the Wisconsin/Minnesota territory, Ms. Bodine's new manager, Tom Mazur, unjustifiably disciplined Ms. Bodine for a performance unfairly characterized as "clearly below expectations".

166. The demotion of Ms. Bodine into the Wisconsin/Minnesota territory, the demotion from the Town of Cary account, the corresponding substantial compensation loss, and the unfair disciplinary action created a situation that an objective, reasonable person would find so intolerable that voluntary termination was the only reasonable alternative for Ms. Bodine.

## SECOND CLAIM FOR RELIEF – UNLAWFUL DISCRIMINATION UNDER FEDERAL LAW

167. Ms. Bodine re-alleges the allegations contained in the preceding paragraphs.

168. Salesforce violated Ms. Bodine's right to be free from employment discrimination based on sex in violation of Title VII, 42 USC §2000e-5, *et seq*. Salesforce also created an abusive working environment for Ms. Bodine that became so intolerable that her resignation qualified as a fitting response.

169. Ms. Bodine is entitled to an award of compensatory and punitive damages and to an Order of injunctive and affirmative relief, including

reinstatement to her prior territories, and/or an award of back pay and front pay for Ms. Bodine's constructive discharge.

## THIRD CLAIM FOR RELIEF – ILLEGAL RETALIATION UNDER FEDERAL LAW

170. Ms. Bodine re-alleges the allegations contained in the preceding paragraphs.

171. Salesforce violated Ms. Bodine's right to be free from illegal retaliation for engaging in protected activities in violation of Title VII, 42 USC §2000e-5, *et seq*.

172. Ms. Bodine is entitled to an award of compensatory and punitive damages and to an Order of injunctive and affirmative relief.

## FOURTH CLAIM FOR RELIEF – UNLAWFUL DISCRIMINATION UNDER MONTANA LAW

173. Ms. Bodine re-alleges the allegations contained in the preceding paragraphs.

174. Salesforce violated Ms. Bodine's right to be free from employment discrimination based on sex in violation of Montana's Human Rights Act, § 49-2-301, M.C.A.

175. Ms. Bodine is entitled to an award of compensatory and punitive damages and to an Order of injunctive and affirmative relief, including

reinstatement to her prior territories, and/or an award of back pay and front pay for

Ms. Bodine's constructive discharge.

## FIFTH CLAIM FOR RELIEF – ILLEGAL RETALIATION UNDER MONTANA LAW

176.   Ms. Bodine re-alleges the allegations contained in the preceding

paragraphs.

177.   Salesforce violated Ms. Bodine's right to be free from illegal

retaliation for engaging in protected activities in violation of § 49-2-301, M.C.A.

178.   Ms. Bodine is entitled to an award of compensatory and punitive

damages and to an Order of injunctive and affirmative relief.

## REQUEST FOR RELIEF

WHEREFORE, Kim Bodine respectfully requests the Court to grant the

following relief against Salesforce:

1.      For all damages allowed by Montana's Wrongful Discharge from

Employment Act, including the sum of four years of wages and fringe benefits.

2.      Alternatively, all damages a jury deems sufficient to compensate

Ms. Bodine for harm, pecuniary and otherwise, that she sustained as a result of

Salesforce's discriminatory, harassing, and retaliatory acts.

3.      Order Salesforce to pay Ms. Bodine punitive damages in an amount a

jury deems sufficient to deter Salesforce and similarly situated others from

engaging in similar unlawful acts in the future.

4.    Enjoin Salesforce from engaging in similar acts of unlawful discrimination or illegal retaliation towards its employees.

5.    Order Salesforce to take such affirmative steps, including training of its managerial staff, as will minimize the likelihood of future violations of Title VII.

6.    For all attorneys' fees and costs Ms. Bodine incurs herein as allowed by law.

7.    For interest as may be allowed by law.

8.    For such other relief as the Court may deem just and proper.

DATED this 21st day of November, 2018.

BERG LILLY, PC

By: _____

Bridget W. leFeber
*Attorneys for Plaintiff*

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable in this case.

Dated this _21st_ day of November, 2018.

BERG LILLY, PC

By: _____

Bridget W. leFeber
*Attorneys for Plaintiff*

**Page 37 of 37**